**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JAMIE DEAN SMITH**                                                                           **PLAINTIFF**

**v.**                                                           CIVIL ACTION NO.: 1:25cv270 LG-BWR

**HUNTINGTON INGALLS INCORPORATED**                                      **DEFENDANT**

**COMPLAINT
JURY TRIAL DEMANDED**

**COMES NOW** the Plaintiff, Jamie Dean Smith, by and through her counsel, Watson & Norris, PLLC, brings this action to recover damages for violations of her rights pursuant to Title VII of the Civil Rights Act of 1964 for retaliation, violations of her rights pursuant to the Americans with Disabilities Act (ADA) for disability discrimination, violations of her rights pursuant to Title VII of the Civil Rights Act of 1964 for sex discrimination, and violations of her rights pursuant to Title VII of the Civil Rights Act of 1964 for sexual harassment and a sexually hostile work environment against the Defendant, Huntington Ingalls Incorporated. In support of this cause, the Plaintiff would show unto the Court the following facts to-wit:

**THE PARTIES**

1.     Plaintiff, Jamie Dean Smith, is a female resident of Jackson County, Mississippi.

2.     Defendant, Huntington Ingalls Incorporated, may be served with process by serving its registered agent, C T Corporation System, 645 Lakeland East Drive, Flowood, Mississippi 39232.

**JURISDICTION AND VENUE**

3.     This Court has federal question jurisdiction pursuant to Title VII of the Civil

1

Rights Act of 1964 and the Americans with Disabilities Act (ADA).

4.    This Court has subject matter jurisdiction, and venue is proper in this Court.

5.    Plaintiff filed a Charge of Discrimination with the EEOC on November 20, 2024, a true and correct copy of which is attached as Exhibit "A."  On March 25, 2025, Plaintiff amended her Charge of Discrimination with the EEOC, a true and correct copy of which is attached as Exhibit "B." The EEOC issued a Notice of Right to Sue on June 4, 2025, a true and correct copy of which is attached as Exhibit "C."  Plaintiff timely files this action within ninety (90) days of receipt of her Notice of Right to Sue.

## STATEMENT OF FACTS

6.    Plaintiff is a 46-year-old female resident of Jackson County, Mississippi.

7.    On April 2, 2020, Plaintiff was hired at Huntington Ingalls Incorporated (HI).

8.    Between January 2024 and February 2024, Plaintiff was sexually harassed by General Foreman Jeffery Holmes.

9.    After Plaintiff reported the sexual harassment, Mr. Holmes was terminated in May 2024.

10.    After that, on May 23, 2024, Plaintiff was retaliated against in that she was passed over for a pay increase promotion to the position of Welding Foreman.

11.    Also, during June and July 2024, she was issued frivolous and unsubstantiated write ups that she contends were issued in retaliation against her after she made her complaint of sexual harassment.

12.    Additionally, since Plaintiff reported sexual harassment against Mr. Holmes, Superintendent Saint Clyde Curtis Black, who is a close friend of Mr. Holmes, has made

2

harassing statements about Plaintiff's medical conditions (i.e., PTSD, anxiety, depression, and a restrictive lung condition), alleging that she is feigning illness and that she doesn't really need to be on FMLA leave.

13.    He has shown a persistent pattern of harassing Plaintiff that constitutes harassment related to her disabilities and is retaliatory against her after she made her complaints of sexual harassment.

14.    Mr. Black's harassing behavior has continued even after Plaintiff has complained about it, such that she is being subjected to a hostile work environment.

15.    On November 20, 2024, Plaintiff filed an EEOC Charge of sex discrimination, sex harassment, and retaliation against HI (Charge #: 425-2024-01706).

16.    On November 20, 2024, Plaintiff filed an EEOC Charge of sex discrimination, sex harassment, and retaliation against Boilermakers Local 693 (Charge #: 425-2024-01707).

17.    On December 20, 2024, in response to Plaintiff's Charge (425-2024-01706), HI submitted a Position Statement to the EEOC.

18.    HI's Position Statement alleges that, "Plaintiff cannot show unlawful sexual harassment or retaliation. Initially, Plaintiff did not timely file her charge within the 180 day statute of limitations over alleged sexual harassment by Mr. Jeffery Holmes, after Ingalls reassigned and demoted her back to a Structural Work Leaderman position, and after Ingalls notified her that she had not been selected for the Welding Foreman position. In addition, Ingalls did not take adverse action against Plaintiff in issuing disciplinary action that later was voided. Ingalls also did not take an adverse action when Plaintiff exercised her right of seniority to move to the Shell Shop prompting her demotion to a Structural

3

Welder position. Finally, the clear and convincing evidence shows that Plaintiff falsely alleged that Mr. Marsha Barnes sexually harassed her or took adverse action for not submitted to his alleged sexual advances."

19.    Plaintiff contends this allegation is false.

20.    After Plaintiff was sexually harassed by Mr. Holmes between January and February 2024, she reported the sexual harassment.

21.    Plaintiff provided detailed, face-to-face accounts to HII Ethics investigators and supervisors, describing Mr. Holmes' escalating harassment, which culminated in forced sexual contact.

22.    Plaintiff explained during interviews the explicit details of the sexual assault in different compartments of the ship and the dates on which the incidents took place.

23.    Plaintiff reported that Mr. Holmes forced himself on her, raped her by performing nonconsensual oral sex while she was incapacitated, and he attempted full penetration that she managed to prevent by physically fighting him off.

24.    Prior to the assault, Mr. Holmes had already attempted to kiss her and touch her hand, advances that she refused. None of these acts were consensual.

25.    On February 17, 2024, Plaintiff reported the sexual harassment and sexual assault she had endured from Mr. Holmes to Superintendent John Norris.

26.    Rather than addressing the report, Mr. Norris relayed the report to General Superintendent Saint Clyde Black.

27.    Mr. Black, likewise, did not immediately do anything to address the report.

28.    Although Mr. Holmes was terminated in May 2024, his termination was not due to sexual harassment but mischaracterized by HII as the result of a "consensual

relationship."

29.    This framing deliberately minimized the severity of his misconduct and disregarded her consistent, detailed reports.

30.    Mr. Holmes admitted to investigators that he had sexual contact with Plaintiff, yet investigators accepted his claim that it was a "consensual sexual relationship", while dismissing Plaintiff's statements to the contrary.

31.    HII's Ethics investigators and legal department, along with Mr. Holmes, manipulated the narrative to protect Mr. Holmes and shield the company from liability.

32.    HII's attempt to rewrite these events as consensual was not only inaccurate but exacerbated the injuriousness of the sexual harassment/assault.

33.    HII's failure to acknowledge the full scope of Plaintiff's reports, its omission of key witness statements, and its selective quotation of text messages demonstrated a systematic effort to minimize and distort the truth.

34.    Following Plaintiff's reports, retaliation against her intensified.

35.    General Superintendent Black spread false rumors that Plaintiff had a consensual relationship with Mr. Holmes.

36.    Witnesses, including Barnes and Drummond, confirmed that Mr. Black falsely alleged to DDG management that Plaintiff had spent nights at Mr. Holmes' house.

37.    Mr. Black further alleged that Plaintiff's demotion was because Mr. Holmes and Plaintiff were in a consensual relationship.

38.    These retaliatory false rumors were weaponized to discredit Plaintiff, to justify her removal from leadership, and to destroy her professional credibility.

39.    Mr. Black's retaliation also manifested in that less qualified male Foremen,

many of whom later faced disciplinary action, were promoted over Plaintiff, while she, a highly qualified female Foreman with no disciplinary record, was denied advancement and stripped of leadership.

40.     Once she was demoted, no women remained in DDG management, exposing the broader culture of gender discrimination.

41.     Plaintiff also disputes that the EEOC Charge was not filed timely.

42.     She made a legally protected complaint of sexual harassment directly to HII, as detailed above.

43.     Then her EEOC Charge of retaliation was filed on November 20, 2024, within 180 days after she was passed over for a pay increase promotion on May 23, 2024.

44.     Moreover, she was further retaliated against after May 23rd, with the issuance of multiple frivolous disciplinary actions (as will be detailed further below).

45.     Plaintiff contends that the allegation that she falsely reported sexual harassment by Mr. Marshae Barnes is itself false.

46.     Mr. Barnes' conduct escalated from unwelcome remarks into quid pro quo harassment.

47.     By late May 2024, Mr. Barnes made explicit threats tying Plaintiff's continued employment and protection from retaliation by Mr. Black to sexual compliance (with Mr. Barnes).

48.     On May 25, 2024, May 29, 2024, June 17, 2024, and June 19, 2024, Mr. Barnes threatened Plaintiff with disciplinary action or loss of support unless she agreed to his sexual advances.

49.     He told her directly that he would "remove" prior disciplinary actions and

stop issuing new ones if she agreed to a sexual relationship, but that otherwise he would ensure she was written up until she was fired.

50.     HI's Position Statement alleges that, "On April 3, 2020, Ingalls hired Plaintiff as a Structural Welder. In this position, Plaintiff's terms and conditions of employment are covered by a collective bargaining agreement ("CBA") between Ingalls and the Pascagoula Metal Trades Council, AFL-CIO ("Union"). *See* Exhibit A.

The CBA, in the Management Functions clause, provides Ingalls the right to discipline employees for proper cause and to observe its rules and regulations as appearing in Manuals of Regulations. At the back of the CBA, Ingalls provides its "Manual of Rules and Regulations" regarding various rules that can subject employees to discipline. The CBA provides a grievance and arbitration procedure should Plaintiff or the Union believe Ingalls did not have proper cause for the discipline, demotion, job reclassification or any adverse action in regard to her terms and conditions of employment. *See* Exhibit A, at pp. 29-33, 62-69.

The CBA provides that disciplinary action notices ("DANs") are "effective for one-hundred twenty (120) days at which time" they are deemed void. *See* Exhibit A, at p. 36. An employee who receives a DAN within 120 days of a DAN issued for the exact same offense results in a three step or four step progressive discipline process that could prompt discharge. Otherwise, an employee may be discharged under the Multiple Offender Rule if the employee receives five DANs for any type of offense if all DANs issue within 120 days of each other. *See* Exhibit A, at pp. 69

In addition to the grievance procedure, an employee has numerous means to complain about terms and conditions of employment including sexual harassment and retaliation.

For example, a widely disseminated Anti-Harassment procedure provides various means to complain, even anonymously, about sexual harassment and retaliation. *See* Exhibit B. As another example, the Ethics and Business Conduct Office maintains an Open Line procedure that publicizes a 1-800 number that employees can call, even anonymously, to complain about sexual harassment and retaliation. *See, e.g.* Exhibit C."

51.    Plaintiff contends that HII's reliance on the existence of the Collective Bargaining Agreement ("CBA") and its disciplinary and complaint procedures is both incomplete and misleading.

52.    Plaintiff concedes that her employment as a Structural Welder began in April 2020 and was governed by the CBA, yet the mere existence of contractual procedures does not absolve the company of liability for unlawful harassment, retaliation, or discrimination under Title VII, the ADA, or other federal protections.

53.    While HII claims Plaintiff's reassignment to Structural Welder was the voluntary exercise of seniority rights, Plaintiff contends this is a misrepresentation.

54.    She invoked seniority under coercive circumstances after Mr. Barnes explicitly threatened continued discipline and termination unless she submitted to a sexual relationship.

55.    General Superintendent Black further ensured that Plaintiff would not be placed in a Work Leader role in the Shell Shop, despite operational need and supervisor support, specifically because she had filed EEOC complaints.

56.    This was not a voluntary or neutral reassignment – it was a demotion resulting from retaliation and quid pro quo harassment.

57.    Plaintiff further contends that HII omits the fact that other male Work

Leaders were not subjected to comparable treatment.

58.    For example, Journeyman Welder Judas Knight was later placed as Work Leader under Mr. Barnes but was never required to weld full shifts or targeted with excessive disciplinary actions.

59.    Across the shipyard, Work Leaders are not ordinarily issued disciplinary actions because accountability for final work review rests with the Foreman.

60.    The decision to single out Plaintiff for both excessive welding assignments and disciplinary write-ups – when male counterparts were not treated the same – demonstrated both retaliatory and discriminatory intent.

61.    Plaintiff also contends that while HII highlights its anti-harassment procedures and Open Line reporting mechanisms as evidence of compliance, in practice these procedures were ineffective and compromised.

62.    Plaintiff repeatedly reported sexual harassment, retaliation, and ADA violations through multiple channels, i.e., Ethics investigators, the 1-800 hotline, direct supervisors, and union leadership.

63.    Despite these efforts, her complaints were minimized, reframed to protect male supervisors, or ignored altogether.

64.    In several instances, management and investigators not only failed to act, but also weaponized Mr. Holmes' shifting narrative of a "consensual relationship" against Plaintiff, allowing retaliation and false rumor-spreading to persist unchecked.

65.    The existence of reporting mechanisms on paper is meaningless when the employer consistently fails to act on complaints in good faith.

66.    In sum, HII's reliance on the CBA and internal complaint procedures does

not insulate it from legal liability.

67.    The disciplinary actions Ms. Smtih received were retaliatory in both purpose and effect, her demotion was deliberate and coerced, her treatment was disparate compared to male counterparts, and her use of internal complaint avenues was met with inaction, retaliation, and further harm.

68.    These facts establish that the procedures HII cites were inadequate in practice and do not negate its responsibility under federal anti-discrimination and anti-retaliation laws.

69.    HI's Position Statement alleges that, "On about June 19, 2023, Plaintiff was selected as a Structural Welder Work Leaderman ("WL") which is also a union represented position. A Work Leaderman performs the duties of her craft but also assists the crew Foreman with tasks for the crew. A Work Leaderman is selected for the purpose of working with a specific Foreman. A Structural Welder WL earns a premium of 5% above the pay rate for a Structural Welder. As of January, 2024, Plaintiff's hourly pay rate as a Structural Welder WL was $30.50/hour."

70.    Plaintiff contends that HII's description of her role as a Work Leaderman ("WL") beginning in June 2023 is incomplete and misleading, because it omits critical context about how she was recruited, promised advancement, and then retaliated against after she reported sexual harassment by Mr. Holmes in early 2024.

71.    When she interviewed for the Work Leader position on or about May 2023, Plaintiff also interviewed for the Welding Foreman position.

72.    Plaintiff scored among the highest in the candidate pool for both Work Leader and Foreman.

73.    Despite her qualifications and strong interview performance, she was overlooked for the Foreman role.

74.    Not only was she passed over in favor of less qualified internal candidates, but General Superintendent Black also hired external applicants for the Welding Foreman position, despite HII's own recruiters repeatedly stating that current employees were to be given precedence over outside candidates.

75.    The CBA makes it clear that Work Leaders are not intended to be used as full-time welders; their primary function is supervisory, assisting Foremen with crew oversight, work distribution, training, and administrative duties.

76.    Welding, if required, is capped at approximately four (4) hours per day.

77.    Prior to her complaints of sex harassment, Plaintiff's welding as WL was limited to training or occasional assistance.

78.    After she reported Mr. Holmes' misconduct and was reassigned under Foreman Marshae Barnes, Plaintiff's WL role was deliberately weaponized against her.

79.    Mr. Barnes, with the support of General Superintendent Black, stripped Plaintiff of her supervisory duties and required her to weld 8–10 hours nearly every day, in clear violation of the CBA.

80.    This misuse of her role was not neutral. It was a retaliatory measure designed to punish her for reporting harassment, to humiliate her in front of her team, and to deprive her of meaningful leadership experience needed for advancement.

81.    While serving as a Work Leader, Plaintiff was issued multiple Disciplinary Action Notices (DANs)—something virtually unheard of for WLs across the shipyard.

82.    In normal practice, accountability for work quality rests with the Foreman,

not the WL.

83.    Prior to being placed under Mr. Barnes, Plaintiff had never received DANs in this capacity.

84.    Male WLs were not treated this way.

85.    For example, Judas Knight, who was Mr. Barnes' WL prior to Plaintiff and again became his WL in June 2024, was never forced to weld full shifts and was never subjected to comparable DANs.

86.    Throughout her tenure as a Work Leader prior to being assigned under Mr. Barnes, Plaintiff had not received a single DAN.

87.    Only after making her complaint of sex harassment, did she suddenly face a pattern of excessive discipline.

88.    The excessive welding assignments were retaliatory and a misuse of Plaintiff's Work Leader role, and they directly aggravated her ADA-protected conditions.

89.    Plaintiff suffers from restrictive lung disease, PTSD, and anxiety, and these conditions were severely exacerbated by the physical strain of being forced to weld 8–10 hours daily in violation of CBA limits.

90.    This combination of physical overexertion and psychological distress triggered repeated panic attacks, asthma episodes, vomiting, and diarrhea.

91.    These episodes were plainly visible to Plaintiff's team members, who witnessed her rushing to the bathroom or struggling to breathe at her workstation.

92.    Despite these obvious signs of medical impact, Mr. Black and Mr. Barnes refused to accommodate Plaintiff's restrictions.

93.    Their actions not only worsened her condition but ultimately forced her to

take FMLA leave.

94.    HI's Position Statement alleges that, "On about February 7, 2024, Mr. Jeffery Holmes (General Foreman) selected Plaintiff to work as a Re-Rate Foreman to help with compartment completions. Ingalls will "re-rate" a craft employee to temporarily perform the duties of a Foreman if the existing Foreman was out on a leave of absence or there was a temporary need for a Foreman. This is not a permanent position and an employee must apply for an open job posting and interview for a position as a Foreman. Plaintiff's hourly pay rate as a Re-Rate Foreman was $31.18/hour."

95.    Plaintiff contends that HII's characterization of her service as a Re-Rate Foreman as a "temporary" assignment is incomplete and misleading.

96.    While the ReRate Foreman is not a permanent position, it is understood to be a transitional position.

97.    The Re-Rate Foreman role to which Plaintiff was selected on or about February 7, 2024, was not a short-lived or casual assignment.

98.    Compartment Completion (Hull Craft Complete) is a bona fide Foreman function that extends through the final phases of ship construction and remains critical through Sea Trials.

99.    Her responsibilities in this role were substantive, ongoing, and indistinguishable from those of other Foremen.

100.   Mr. Holmes himself repeatedly told Plaintiff, both in person and via text, that she was "next in line" for promotion to Welding Foreman.

101.   In a February 2, 2024 text, he wrote that Plaintiff would begin as a Re-Rate Foreman "the way 80 percent of Foremen begin," describing this as his way of

13

"positioning" her for permanent advancement.

102.    On January 31, 2024, Superintendent Norris personally confirmed via text that the Welding Foreman requisition was posted online and encouraged Plaintiff to apply.

103.    Additionally, in December 2023, during a meeting between Plaintiff, Ship Management Superintendent Fuller, and General Superintendent Black, Mr. Fuller requested that Plaintiff be released to serve as a Boat Foreman (a role equivalent to Hull General Foreman).

104.    Mr. Black refused, however, explicitly stating that Plaintiff was already being transitioned into a Welding Foreman position.

105.    These assurances, made by multiple supervisors and decision-makers, make clear that Plaintiff's Re-Rate Foreman role was a recognized pathway to permanent advancement.

106.    Mr. Holmes conditioned these assurances, however, on sexual compliance.

107.    He frequently stated to Plaintiff, "I put the white hat on your head, and I can take it off."

108.    On February 9, 2024, after Plaintiff declined his repeated invitations to dinner, he offered her money for sex.

109.    On February 24, 2024, Mr. Holmes physically assaulted Plaintiff in compartment 0.5-MM-O-V, grabbing her and threatening her.

110.    He stated, "You have no idea how much you've messed up by trying to report me. If you stop playing with me and get with the program, I can make all of this go away. But if you keep being stupid, your career will be over."

111.    On February 26, 2024, without prior notice, Mr. Holmes announced that

14

Plaintiff was no longer their Foreman and he was replacing her with 808 Work Leader Darcel Buckner.

112.    Mr. Holmes then dismissed Plaintiff and ordered her to report to Mr. Norris's office.

113.    That same day, Mr. Norris told Plaintiff that Mr. Holmes made the decision to demote her, that Mr. Black supported it, and that "there is nothing I can do."

114.    This was not a neutral reassignment.

115.    It was a retaliatory demotion carried out immediately after Plaintiff's repeated refusal of Mr. Holmes' sexual demands.

116.    Notably, Mr. Buckner had previously failed as a Re-Rate Foreman and expressed no interest in being promoted, yet he and Kenneth Lofton were paired together to assume responsibilities that Plaintiff had been forced to carry out alone without support.

117.    Mr. Buckner's reinstatement to a role he had already failed in further underscores the discriminatory and retaliatory nature of Plaintiff's removal.

118.    Despite her demotion, Plaintiff repeatedly voiced complaints of Mr. Holmes' sexual harassment.

119.    On February 17, 2024, Plaintiff reported directly to Mr. Norris, in Mr. Holmes' presence, that Mr. Holmes had told her she would only remain Foreman if she slept with him.

120.    Mr. Norris escalated the report to Mr. Black, who responded only by saying Mr. Holmes and Plaintiff should "separate" and promised a later meeting that never occurred.

121.    On February 28, 2024, Plaintiff again went to Mr. Black to report Mr. Holmes'

15

sexual harassment, assault, retaliation, and threats.

122.    She asked Mr. Black why she was demoted and asked him if she was still going to transition to the position of Welding Foreman.

123.    Mr. Black dismissed Plaintiff and stated, "It was Holmes' decision to demote you, and I agreed with it… What makes you think you're even going to be interviewed for the job? Now stop with all of that and don't mention it to me again."

124.    On February 29, 2024, Plaintiff called the Huntington Ingalls Ethics Hotline to formally report Mr. Holmes' sex harassment, sexual assault, and retaliation.

125.    On March 8, 2024, HR representative Ms. Joyce escorted Plaintiff to the maintenance investigation room to meet with investigator Adam Gibbons, regarding her hotline call.

126.    On March 26, 2024, Plaintiff submitted a formal written complaint documenting Mr. Holmes' sexual assault, sex harassment, and retaliation.

127.    These reports demonstrate that she consistently engaged in legally protected activity throughout February and March 2024.

128.    HI's Position Statement alleges that, "By February 29, 2024, Plaintiff had made an informal and formal complaint of sexual harassment and retaliation by Mr. Holmes. Ingalls conducted an extensive investigation of her complaint. Plaintiff made significant contradictory statements during several interviews that substantially undermined her credibility. For example, in her first interview, Plaintiff stated that, from the very beginning, she "turned down" all sexual advances by Mr. Holmes and that she "told him almost daily to leave her alone". But, Plaintiff went with Mr. Holmes out of town to a New Orleans Saints football game, out to dinner and borrowed money from Mr.

Holmes. Text messages by Plaintiff also conflicted with her initial statement. For example, Plaintiff texted Mr. Holmes "I think we need to have a drink after work". In another text message, she asked him "Are you up to giving me a rub down later? I'll do your neck and back for you if you want me to" and "It will either be later this evening or tomorrow", "are you good with that?", "If so, I'll keep you posted". See Exhibit C."

129.    Plaintiff contends that this allegation mischaracterizes both the context and substance of Plaintiff's prior interactions with Mr. Holmes to undermine her credibility.

130.    HII selectively cited isolated events from 2023, while disregarding the broader record of sex harassment, sex assault, and retaliation that occurred in 2024 when Mr. Holmes was her supervisor.

131.    The referenced football game, borrowed money, and limited after-work interactions all occurred in 2023, during a period of personal hardship when Plaintiff suffered multiple family deaths in close succession.

132.    At that time, Mr. Holmes presented himself to her as a mentor and friend and persistently invited her to the Saints games as "a way to get you out of the house."

133.    After repeatedly declining, Plaintiff eventually relented at the last minute due to his persistence and assurances that it was not a date.

134.    During that time, Plaintiff traveled back and forth between Pascagoula and Jackson to care for dying family members.

135.    Mr. Holmes offered financial assistance, framing it as support for travel expenses.

136.    Although he gave her the money, Plaintiff insisted on repaying him. Plaintiff made it clear that she had no romantic or sexual interest in Mr. Holmes.

17

137.    Plaintiff contends that her statements to HII were not contradictory, as alleged.

138.    Rather, she consistently explained during multiple interviews that Mr. Holmes initially presented himself as a mentor/friend and offered support during a period of profound personal loss, only to later use that support as a pretext to pressure her to be sexually intimate with him, i.e., sex harassment.

139.    What HII frames as "consensual interactions", were fully platonic and non-romantic, non-sexual interactions.

140.    Mr. Holmes increasingly became upset that Plaintiff was not interested in being sexually intimate with him.

141.    His actions therefore escalated to sex harassment and sexual assault.

142.    Mr. Holmes' financial offers to Plaintiff came both before and after he sexually assaulted her in late September 2023, when he forced oral sex on her while she was incapacitated and he attempted penetration that she fought off.

143.    Mr. Holmes gave Plaintiff financial assistance three times prior to that assault and four times afterward.

144.    Each time, he told her she did not have to pay him back, but she insisted on repayment because she did not want to be indebted to him or give the impression of dependency.

145.    On February 9, 2024, Holmes explicitly offered Plaintiff money in exchange for sex.

146.    He asked her how much he would have to pay her to spend the night with him and give herself to him sexually.

147.    Plaintiff immediately declined and told him never to ask her anything like that again.

148.    Plaintiff explained all of this during multiple interviews with HII investigators, where they repeatedly asked her the same questions in different ways.

149.    Her responses remained consistent.

150.    She did not want a romantic/sexual relationship with Mr. Holmes. She reported his sex harassment and sexual assault.

151.    The few times Plaintiff met Mr. Holmes outside of work were limited, occurred immediately after work hours, were centered on job-related discussions, and were fully platonic.

152.    They all occurred in 2023.

153.    Plaintiff had similar interactions with other male colleagues without issue.

154.    In 2024, however, when Mr. Holmes became Plaintiff's direct supervisor, he attempted to use his power over her to sexually harass and sexually assault her.

155.    During 2023, when Plaintiff texted Mr. Holmes and wrote, "We need to have a drink after work," this was not an invitation for romantic/sexual interaction, as alleged above.

156.    Plaintiff sent this text when she was encountering significant hostility from her then General Foreman Kawana Womack.

157.    Plaintiff repeatedly reported Womack's misconduct to HR and Ethics but nothing was done about it.

158.    This was early in her relationship with Mr. Holmes, and she still considered him a mentor and friend.

19

159.    She was reaching out to him to vent and decompress about the situation with Womack.

160.    Also during 2023, the massage-related texts must also be viewed in the appropriate context.

161.    Plaintiff made it clear she merely wanted a platonic, non-romantic, non-sexual relationship with Mr. Holmes.

162.    Due to various personal and professional issues, Plaintiff felt very stressed and simply sought a way to relax.

163.    Plaintiff never intended nor agreed to a sexual encounter, nor did she ever go to Mr. Holmes' home, as his subsequent texts falsely imply.

164.    Plaintiff contends that her internal complaints and her EEOC Charges focused on events in 2024.

165.    That is when Mr. Holmes conditioned her continued role as Re-Rate Foreman on her participating in sexual relations with him.

166.    Mr. Holmes then physically assaulted her on January 19, 2024 and February 24, 2024, and he retaliated against her by demoting her on February 26, 2024.

167.    At no point during 2024 did Plaintiff engage in social outings, borrowing money, or suggest personal encounters with Mr. Holmes.

168.    HII's reliance on events from 2023 is a deliberate attempt to distract from the unlawful harassment and retaliation she endured under Mr. Holmes' supervision in 2024.

169.    HI's Position Statement alleges that, "Ultimately, the investigation determined that Plaintiff's complaint of sexual harassment, retaliation and civility against

Mr. Holmes was unsubstantiated. Ingalls policies prohibit a romantic partner from working in the same chain of command as their partner. *See* Exhibit D. That policy requires that the supervisor and the employee must notify Ingalls if they fall in the same chain of command. The investigation determined that Plaintiff and Mr. Holmes had a consensual romantic relationship and that he steered Plaintiff into his chain of command. (Effective May 8, 2024, Ingalls terminated Mr. Holmes for violating this policy.) The investigation determined that Mr. Holmes did not retaliate against Plaintiff because of her complaint. Rather, with input from Human Resources, on about February 23, 2024, Superintendent John Norris notified Plaintiff and moved her back to her prior assignment as a Structural Welder WL to comply with the policy, to separate Plaintiff and Mr. Holmes pending investigation of her complaint and because of her poor work performance as a Re-Rate Foreman. See Exhibit C."

170. Plaintiff contends that HII's conclusion that her complaint of sexual harassment and retaliation by Mr. Holmes was "unsubstantiated" was based on the false premise that her relationship with Mr. Holmes was a "consensual romantic relationship".

171. Plaintiff maintains that this allegation is patently false, misleading, and contrary to the record she consistently provided to HII investigators.

172. Notably, while Plaintiff was demoted within a week after she reported Mr. Holmes to Mr. Norris, Mr. Holmes was never demoted prior to his termination.

173. When Plaintiff asked Mr. Black why she was being demoted instead of transferred to a different program, he refused to respond to her.

174. Plaintiff consistently reported, both verbally and in writing, that Mr. Holmes subjected her to repeated unwanted advances, quid pro quo demands, and ultimately

sexual assault.

175.   On February 9, 2024, Mr. Holmes offered Plaintiff money in exchange for sex, explicitly asking how much he would have to pay to sleep with her.

176.   Plaintiff immediately declined and told him never to make such a request again.

177.   Mr. Holmes' account to investigators changed repeatedly.

178.   At first, he denied any misconduct.

179.   Later, he admitted to "sexual contact". Then later still, he alleged there was a consensual relationship.

180.   By contrast, Plaintiff's account never changed.

181.   She consistently rejected his sexual advances, she documented the sex harassment, and she reported his threats.

182.   HII's choice to adopt Mr. Holmes' shifting stories over her consistent testimony reflected its sex discriminatory bias and bad faith.

183.   As already described above, on February 26, 2024, Mr. Holmes demoted Plaintiff, motivated by retaliatory animus.

184.   HII falsely alleges that Mr. Norris reassigned Plaintiff on February 23, 2024.

185.   This is demonstrably false.

186.   Plaintiff asserts she was demoted, and it occurred on February 26th, not February 23rd.

187.   HII's allegation that Plaintiff was removed from the Re-Rate Foreman position due to "poor performance" is demonstrably false and a pretext for retaliation.

188.   Under Plaintiff's leadership on both the LPD and DDG programs,

documented company records demonstrate that production increased, and quality consistently met or exceeded the standards expected of a qualified Welding Foreman.

189.   At no point during her tenure as Work Leader (beginning June 2023) or during prior Re-Rate Foreman assignments did Plaintiff ever receive a Disciplinary Action Notice (DAN) or any coaching/counsel for poor performance.

190.   To the contrary, she received multiple text messages and written communications from supervisors—including Mr. Holmes, Mr. Norris, and Mr. Black— affirming that she was "doing a good job" and commending her leadership.

191.   Furthermore, when Plaintiff first met Hull Chief of Staff Jenni Jones during a company survey in the fall of 2023, she personally acknowledged Plaintiff's strong performance and growing reputation.

192.   Her exact words to Plaintiff were: "Oh, you're Queen, Jamie Dean Smith— the lady that's doing so well as a Work Leader on the LPD program. I'm hearing so many great things about you as a Work Leader, and upper management is going on and on with your praises, stating that you're going to be the next best Welding Foreman. I've been wanting to meet you. It's a pleasure to meet you. Keep doing a good job for us, as we have big plans for you in the Hull Department."

193.   By contrast, other male Foremen with significantly worse performance metrics—including Tubbs, Baptiste, Gates, Burns, and Barnes—were retained or promoted despite failing to meet expectations or producing high QA reject rates.

194.   Plaintiff contends that if her complaints of sex harassment and retaliation were truly "unsubstantiated" and Mr. Holmes' only violation was a neutral conflict-of-interest policy, there would have been no legitimate basis for termination.

195.    In practice, HII has routinely handled alleged conflicts of interest through reassignment or separation of reporting chains, not termination.

196.    For example, when General Foreman Hunter Sullivan engaged in a relationship with subordinate Sydney Miller, neither were terminated.

197.    Instead, both were ultimately promoted, with Miller being transferred to a different area.

198.    Holmes' dismissal in May 2024 confirmed the seriousness of his misconduct.

199.    HII's effort to recast his removal as a mere "policy violation" is a false narrative.

200.    The inconsistent treatment compared to other supervisors in relationships (such as Sullivan and Miller, or Barnes promoting his own friends and associates) demonstrates that HII does not uniformly enforce its conflict-of-interest policy.

201.    Mr. Barnes admitted openly to Plaintiff that since Mr. Holmes was terminated under the pretext of "conflict of interest," HII considered him eligible for rehire after six months.

202.    Mr. Barnes further stated that the plan was to force Plaintiff out within that six-month window so Mr. Black could bring Mr. Holmes back as a Welding Foreman and eventually promote him again to General Foreman.

203.    That plan failed only because Plaintiff filed charges with the EEOC and pursued protections through the National Labor Relations Board, which made retaliation more difficult to execute openly.

204.    Plaintiff contends that HII management and investigators were also fully

aware that Mr. Holmes was previously terminated for sexual harassment while serving as the night-shift manager over Welding Instructors at the HII Training Center, employed through Mississippi Gulf Coast Community College (MGCCC).

205.    Plaintiff raised this fact during the internal investigation, and HII leadership did not dispute it.

206.    Investigator Gibbons himself acknowledged his awareness but dismissed it as irrelevant, stating, "that doesn't have anything to do with this."

207.    Rather than treating Plaintiff's allegations as credible considering Mr. Holmes' known history, HII deliberately reframed her complaint as a so-called "consensual relationship".

208.    Plaintiff contends this mischaracterization was not accidental; it was a deliberate attempt to distort the events that occurred.

209.    HI's Position Statement alleges that, "On about July 1, 2024, Plaintiff voluntarily reclassified to the position of Structural Welder. The CBA provides that "[s]enior employees shall be given preference in shop assignments". *See* Exhibit A, at p. 24. In June, Plaintiff asked to exercise her seniority rights to transfer to the Shell Shop. The Foreman who she would work for at the Shell Shop already had a Work Leaderman. General Superintendent St. Clyde Black explained to Plaintiff that if she prompted the transfer she would no longer be a Work Leaderman and be reclassified as a Structural Welder. Plaintiff initially withdrew her transfer request. On July 1, 2024, however, the Hull department had received another request by Plaintiff to transfer to the Shell Shop. *See* Exhibit E. Accordingly, by her own unilateral action, Ingalls reassigned her to the Shell Shop and reclassified her as a Structural Welder at the CBA rate of $29.78/hour."

210.    Plaintiff asserts that HII's allegation that her July 1, 2024 transfer to the Shell Shop and reclassification to Structural Welder was a voluntary "unilateral action" is false and omits relevant context.

211.    After being demoted by Mr. Holmes from Re-Rate Foreman back to Work Leader, Plaintiff was reassigned to work under Foreman Barnes.

212.    Mr. Holmes continued entering Plaintiff's work areas and harassing her, which prompted Plaintiff to request reassignment to another program.

213.    Plaintiff specifically asked General Superintendent Black to allow her to transfer out of the DDG program entirely—to DDX, LPD, LHA-8, or another department.

214.    Mr. Black, however, denied her request, and told her that if she wanted to remain a Work Leader, she had to stay under Mr. Barnes.

215.    Shortly thereafter, Mr. Barnes began propositioning Plaintiff for sex, telling her that Mr. Black "keeps asking me to write you up," and warning her that unless he complied with Mr. Black's demands, he (Mr. Barnes) would not protect Plaintiff from retaliation.

216.    Mr. Barnes said openly, "If you don't want me to keep writing you up until you get fired, you know what you have to do [referring to sex]. You take care of me; I take care of you."

217.    When Plaintiff refused, Mr. Barnes issued her a write-up.

218.    Plaintiff filed a union transfer request to escape this coercion.

219.    Mr. Black then called a meeting with Plaintiff, Mr. Barnes, and General Foreman Patterson.

220.    When Plaintiff directly asked Mr. Black why his name appeared on her first

DAN, Mr. Black admitted he told Mr. Barnes to write her up.

221.    Later that day, Mr. Barnes told Plaintiff she had made a mistake in not transferring.

222.    He then warned her again that unless she agreed to a sexual relationship, he would continue writing her up, as Mr. Black had ordered him to.

223.    After receiving a second write-up in less than a month, Plaintiff filed another transfer request, not because she wanted to give up her Work Leader position, but because she was being forced out under threat of termination.

224.    When Plaintiff asked Mr. Black if she could retain her Work Leader status by transferring into the Shell Shop as a second Work Leader, he refused.

225.    Plaintiff reminded him that the Shell Shop had historically employed two Work Leaders due to its size.

226.    Mr. Black dismissed her request, saying, "If you're not going to be a Work Leader down here, you're not going to be a Work Leader anywhere. If you transfer, you're going as a welder, and you will lose your Work Leader pay."

227.    Plaintiff pointed out that other male employees continued to be paid as Work Leaders even when they were no longer serving in that capacity.

228.    Mr. Black responded, "That's not your business."

229.    HI's Position Statement alleges that, "On January 31, 2024, Plaintiff applied to a job requisition for a Welding Foreman. *See* Exhibit F. Thirty-eight other candidates applied for the job opening. Ms. Jenni Jones (Chief of Staff for the Hull Department) determined that Plaintiff was not the best qualified applicant for the position. On April 24, 2024, Ingalls sent Plaintiff a notice that she was not selected for the position. *See* Exhibit

G."

230.    Plaintiff contends that the allegation that she was not the best qualified for the Welding Foreman position is false.

231.    Plaintiff contends she was highly qualified and exceptionally prepared for promotion.

232.    During the March–April 2024 interview cycle, Plaintiff learned that she had scored the highest of all candidates and was considered the most qualified.

233.    With over 20 years of management experience, 12 years of welding expertise, and extensive training through MGCCC, Plaintiff's credentials surpassed those of many of the men ultimately selected.

234.    By contrast, several promoted individuals had never served as bona fide Work Leaders or Re-Rate Foremen, despite company policy that those roles should carry weight in foreman selection.

235.    Plaintiff's performance was repeatedly acknowledged by supervisors, including Mr. Holmes, Mr. Norris, and Mr. Black.

236.    In the fall of 2023, Hull Chief of Staff Jenni Jones acknowledged Plaintiff's growing reputation directly during a company Gallop survey.

237.    Her exact words were: "Oh, you're Queen, Jamie Dean Smith, the lady that's doing so well as a Work Leader on the LPD program. I'm hearing so many great things about you as a Work Leader, and upper management has been going on and on with your praises, stating that you're going to be the next best Welding Foreman. I've been wanting to meet you. It's a pleasure to meet you. Keep doing a good job for us, as we have big plans for you in the Hull Department."

238.    This acknowledgment by the very person who later cited Plaintiff as "not the best qualified" highlights the inconsistency in HII's explanation and underscores the pretextual nature of its claim.

239.    Whereas Plaintiff was not promoted, HII promoted less qualified men, including Foremen Tubbs and Baptiste, both of whom personally admitted to Plaintiff that they scored lower on the Foreman interview and had weaker records as Work Leaders or Re-Rate Foremen.

240.    Both Tubbs and Baptiste had been moved between areas for poor performance yet were still promoted.

241.    Beyond individual comparators, the systemic disparity is also clear: of the 38 applicants for Welding Foreman in the DDG program, no women were selected.

242.    The promotions went exclusively to men, reflecting a broader pattern of gender exclusion within HII's leadership decisions.

243.    HI's Position Statement alleges that, "On about June 3, 2024, Foreman Marsha Barnes issued a DAN to Plaintiff for loafing. Plaintiff had been assigned to weld three stainless steel pads on the same unit which took her over two hours to complete. Mr. Barnes did not promptly issue the DAN to Plaintiff. By the time it was issued, however, Plaintiff had exercised her rights in seniority to move to the Shell Shop reporting to a different supervisor. Because of this, on about July 2, 2024, General Foreman James Patterson voided the DAN. (Ingalls does not have a copy of this DAN as DANs are issued electronically. A hard copy is only provided if an employee requests a copy. A voided DAN is not maintained in the electronic system. Plaintiff or the Union may have a copy of this now voided DAN.) The voided DAN has no effect on Plaintiff's employment as it does

not count toward progressive discipline or count toward discharge for five DANs within 120 days under the Multiple Offender Rule."

244.    Plaintiff contends this allegation mischaracterizes the events that occurred and omits relevant context.

245.    HII alleges that Foreman Marsha Barnes issued a DAN to Plaintiff for "loafing" on June 3, 2024, which later voided with "no effect" on her employment.

246.    This account omits the critical retaliatory context within which she received this write-up within less than one month of Mr. Holmes being terminated and the documented events leading up to the write-up.

247.    Foreman Barnes repeatedly admitted that he was under pressure from Mr. Black to "write up [Plaintiff] for any little thing" in order to force her out of the company.

248.    Ms. Barnes told Plaintiff directly, "Black said you'll never be a Welding Foreman. They want you gone."

249.    This comment clearly evidences retaliatory motivation.

250.    The DAN was not voided by General Foreman Patterson as HII asserts.

251.    It was overturned through the union grievance process after a full review, after the fourth step, precisely because it was baseless and retaliatory.

252.    HI's Position Statement alleges that, "On about June 18, 2024, Foreman Marsha Barnes issued a DAN to Plaintiff for unsatisfactory work. A manufacturing analyst, Jeremy Jenkins, determined that Plaintiff performed an inadequate visual test ("VT") of welds. *See* Exhibit H. On about July 17, 2024, the Union filed a grievance over issuance of the DAN. The Union did not dispute that Plaintiff inadequately performed the VT inspection of welds. Rather, the Union asserted that Plaintiff had only recently certified in

VT inspections, that this was her first time doing the assignment, and that Ingalls should have performed a "coach and counsel" for her error instead of issuing a DAN. *See* Exhibit I. On October 3, 2024, at a Step 4 grievance meeting, Ingalls and the Union settled the grievance by voiding the DAN. *See* Exhibit J. The voided DAN has no effect on Plaintiff's employment as it does not count toward progressive discipline or count toward discharge for five DANs within 120 days under the Multiple Offender Rule."

253.    Plaintiff contends this allegation mischaracterizes the events that occurred and omits relevant context.

254.    The June 18, 2024 DAN issued against Plaintiff for "unsatisfactory work" related to VT inspections was baseless, retaliatory, and rooted in quid pro quo harassment.

255.    Evidence, including text messages, comparator evidence, and admissions by both Mr. Black and Mr. Barnes, proves that this was not a legitimate performance action, but a manufactured disciplinary record designed to discredit Plaintiff and block her advancement.

256.    Plaintiff had just completed VT certification in May 2024.

257.    From that point forward, every inspection she performed passed without issue.

258.    This DAN represented her first and only alleged VT "reject."

259.    There was no pattern of errors, no prior complaints, no prior coach and counsel, and no legitimate basis to discipline her for this isolated event.

260.    When the welders informed Plaintiff that the butts were ready for inspection, she immediately notified Mr. Barnes by text.

261.    He replied that he was "on his way" to VT them.

262.    This exchange confirms that Mr. Barnes himself initially assumed responsibility for conducting the inspections.

263.    Later, however, Mr. Barnes reversed himself, called Plaintiff, and instructed her to stop welding and perform the VT inspections in his place, claiming he "didn't have enough time" to get there.

264.    Plaintiff complied in good faith, leaving her welding assignment to complete the inspections so production could continue.

265.    By established company practice, it is the Foreman, not the Work Leader, who bears ultimate responsibility for ensuring all VT inspections are completed properly.

266.    Work Leaders may assist in facilitating inspections, but accountability lies squarely with the Foreman and welders.

267.    In this case, Mr. Barnes shifted that duty to Plaintiff while simultaneously assigning her welding tasks on another unit, placing her in an awkward unreasonable position as a Work Leader.

268.    By standard practice, because she was already assigned welding duties, Mr. Barnes, as the Foreman, should have handled the VT inspections.

269.    Instead, he deliberately placed Plaintiff in an impossible position of managing two roles simultaneously.

270.    On the following Monday, Plaintiff returned to the unit to double-check her own work, as well as the welders', to ensure all inspections had been completed correctly.

271.    Rather than allow her to verify quality, Mr. Barnes stopped her, ordered her off the unit, and said he would check the work himself.

272.    This inconsistency is noteworthy; Mr. Barnes first shifted responsibility to Plaintiff, then later blocked her from confirming accuracy on both June 17 and June 18 and ultimately blamed her for alleged deficiencies in work he had initially agreed to handle.

273.    Mr. Barnes' contradictory conduct demonstrated that he was manipulating the assignment of VT duties, creating conditions for failure, and then blocking her ability to verify the work after the fact.

274.    The alleged "unsatisfactory VT work" occurred on June 15, 2024.

275.    Yet, the DAN was written on June 18 and not issued until June 19, four days later.

276.    If Plaintiff's work had truly been deficient, discipline would have been immediate, particularly given Ingalls' emphasis on production and quality control. Instead, the delay demonstrates that this DAN was manufactured after the fact, following discussion between Mr. Black and Mr. Barnes.

277.    The lapse in time exposes the retaliatory and pretextual nature of the discipline.

278.    Mr. Barnes had repeatedly warned Plaintiff that Mr. Black was pressuring him (Mr. Barnes) to "write up [Plaintiff] for anything" until she was terminated, and that unless she submitted to his (Mr. Barnes') sexual demands, he would not protect her from retaliation.

279.    The June 18th DAN is a direct product of that scheme.

280.    Further, although the DAN was eventually removed at a Step 4 grievance meeting on October 3, 2024, that removal carried no meaningful weight.

281.    By policy, DANs automatically fall off after 120 days; this DAN was set to expire on October 18.

282.    Its "removal" just 15 days before expiration does nothing to remedy the months it remained on Plaintiff's record, where it was actively used to deny advancement opportunities, and tarnish her personnel file.

283.    The timing shows that the DAN was never about performance, it was a retaliatory tool in response to Plaintiff's protected activity.

284.    On June 19, 2024, after the DAN was issued, Mr. Barnes told Plaintiff in front of General Foreman Patterson that he (Mr. Barnes) had not wanted to issue the write-up but claimed Manufacturing Analyst Jenkins told him to do it.

285.    Mr. Barnes stated if Plaintiff wanted it removed, she needed to go talk to Mr. Jenkins about it.

286.    Later, when Mr. Patterson and Plaintiff met with Mr. Jenkins, he was surprised and said he had no knowledge of the write-up.

287.    He further explained that Mr. Barnes had called him down specifically to review the butts, while stating that it was highly unusual to even call him for this because the work involved secondary structure, which they normally do not inspect due to higher priorities.

288.    Mr. Jenkins told both Mr. Patterson and Plaintiff directly that "it doesn't make sense to write Plaintiff up for something so minor like this" and that if anyone should be held accountable, it would be the Foreman—not Plaintiff.

289.    He said, "I don't even know why Barnes included my name on a write up that I had no knowledge of, but if he's saying it's up to me as to whether the write up is

deleted or not, then Patterson tell him to delete it."

290.    Mr. Jenkins then asked Plaintiff if she had ever been coached and counseled regarding VTs.

291.    Plaintiff said "No."

292.    Mr. Jenkins then proceeded to go into more depth about the importance of VTs as well as deeply explained the difference between primary and secondary structures.

293.    While explaining, he said so far that day, there had already been 18 rejects on primary structure.

294.    After explaining, he said to Mr. Patterson, "Tell Barnes Plaintiff has never even received a coach and counsel so he definitely shouldn't have written her up especially since secondary structure isn't even viewed as something to be written up about. I just gave her a coach and counsel with you as a witness, so tell him to take that write up off."

295.    Mr. Patterson and Plaintiff went back to Mr. Barnes and shared everything Mr. Jenkins had said.

296.    Mr. Barnes asked Mr. Patterson, "So Pat, Jenkins really said for me to delete the DAN?"

297.    Mr. Patterson said, "Yeah Man. Jenkins said he didn't know anything about the write up."

298.    Mr. Barnes said, "Well Black is the one who instructed me to call Jenkins and told me to issue the DAN. I gotta call to tell him what Jenkins said and see if he wants me to remove the DAN."

*299.*   Not only did Mr. Barnes continue to shift blame, despite this, Mr. Barnes told Mr. Patterson and Plaintiff he could not remove the DAN because Mr. Black had instructed him not to.

*300.*   Mr. Patterson said to Mr. Barnes: "I don't understand why you issued it in the first place but tell Black that Jenkins and I both want the DAN removed."

*301.*   Once Mr. Patterson walked off, Mr. Barnes and Plaintiff were left standing there.

302.   Mr. Barnes then said to Plaintiff, "You already know why you got this write-up. Black told me to write you up. If you would just do what you're supposed to do and trust me—by having a relationship with me—I will protect you. I'll take this write-up and the other one off too. But if you don't, there's nothing I can do. "Baby girl, Black wants you gone immediately. What happens next is up to you."

303.   Later that morning, Plaintiff went to Mr. Black's office to question the DAN further.

304.   Plaintiff asked Mr. Black to remove the write-up.

305.   She also asked whether he had told Mr. Barnes to issue it.

306.   Mr. Black admitted, in the presence of Ms. Sharon Bass, that he had in fact instructed Mr. Barnes to write up Plaintiff.

307.   Plaintiff confronted him further, saying Mr. Barnes told me that you directed him to "continue writing me up until I was terminated."

308.   Mr. Black responded, "Did Barnes really tell you that?"

309.   Plaintiff said yes, and she offered to call Mr. Barnes into the office to repeat it in front of Mr. Black.

310.    Mr. Black replied, "No, that won't be necessary."

311.    On or about July 17, 2024, the Union filed a grievance over issuance of the DAN.

312.    Plaintiff was forced to pursue the union grievance process, and even through that process HII continued to deny removal.

313.    As a result, this false DAN remained on Plaintiff's record for months, tainting her employment history, affecting her progressive discipline status, and serving its retaliatory purpose of creating a paper trail against her.

314.    HI's Position Statement alleges that, "On about July 26, 2024, Labor Relations Representative Julius Patronas issued a DAN to Plaintiff for violating its rule regarding dignity and respect. *See* Exhibit K; Exhibit A (CBA), at p. 68. Another bargaining unit employee, Harmony Richardson (Welder), filed an Open Line complaint alleging that Plaintiff retaliated against her and called her a "bitch". Ms. Richardson said working under Work Leaderman Smith "has been miserable", that Plaintiff was "targeting" other female employees, had "run off" a few workers and called her a "bitch". Ethics Investigator Adam Gibbons determined there was no merit to Ms. Richardson's claim of retaliation. However, Mr. Gibbons determined that Plaintiff engaged in a "heated" confrontation with Ms. Richardson and used vulgar language by calling Ms. Richardson a bitch". *See* Exhibit L. Based on the findings, Mr. Patronas issued the DAN for violating the rule regarding dignity and respect. As noted above, the CBA provides that DANs are "effective for one-hundred twenty (120) days at which time" they are deemed void. *See* Exhibit A, at p. 36. Accordingly, the dignity and respect DAN, the only remaining DAN issued to Plaintiff this year, is now void and has no effect on her employment."

315.    Plaintiff contends that this allegation is misleading, omits critical context, and ignores the repeatedly hostile and insubordinate conduct of Ms. Richardson.

316.    From the time Ms. Richardson was transferred to Plaintiff's team, her performance and conduct were marked by repeated insubordination, vulgar language, and hostile behavior.

317.    Whenever Plaintiff attempted to coach or hold her accountable for production shortfalls, her responses included profanity such as, "What the fuck!", "I ain't going to do that", "you can kiss the crack of my ass", etc.

318.    She regularly referred to supervisors in vulgar terms, stating that "Patterson can kiss my ass", "Tommy Boler can kiss the crack of my ass", and "SC Black ain't going to do a motherfucking thing to me."

319.    On one occasion during a Take 5, Plaintiff instructed Ms. Richardson to remove her wedding ring for safety purposes, consistent with company policy.

320.    She responded: "Bitch please. I don't give a fuck about Tommy Boler. That motherfucker can kiss the crack of my ass."

321.    Plaintiff replied, "Now you're saying, 'bitch please,' but if you get written up, don't expect me to ask him to take it off."

322.    At that point, Ms. Richardson accused Plaintiff of calling her a bitch.

323.    Plaintiff immediately clarified that she had not called her that but had only repeated her words back to her.

324.    Plaintiff then apologized if repeating her phrase caused offense and explained that she would appreciate it if she (Ms. Richardson) refrained from using that language with her (Plaintiff).

325.    Ms. Richardson accepted the apology yet later misrepresented the interaction.

326.    Beyond this single incident, Ms. Richardson's conduct created a hostile environment for the entire crew.

327.    She repeatedly told co-workers and supervisors that she would continue to call the hotline until Plaintiff was fired.

328.    Multiple team members reported that she solicited them to call the hotline to make false allegations against Plaintiff.

329.    Ms. Richardson made sexual remarks to male crew members, creating discomfort among the team.

330.    She threatened physical harm to Plaintiff and other female welders.

331.    These behaviors are well-documented among the crew and have disrupted productivity, lowered morale, and created a hostile work environment.

332.    Despite these serious and repeated violations of zero-tolerance policies, no disciplinary action of comparable seriousness was taken against her.

333.    Ethics Investigator Adam Gibbons concluded that there was no retaliation but found that Plaintiff engaged in a "heated confrontation" and used vulgar language.

334.    This finding is a mischaracterization and failed to consider the context.

335.    Plaintiff was not "heated"; she did not direct the term "bitch" at Ms. Richardson; she repeated Ms. Richardson's own phrase back to her.

336.    Plaintiff apologized and clarified her statement.

337.    The confrontation arose only because of Ms. Richardson's repeated use of vulgar language and insubordination.

338.    Nevertheless, based on this incomplete finding, Plaintiff was disciplined while Ms. Richardson faced no accountability for her repeated misconduct.

339.    The issuance of this DAN must also be understood in the broader context of retaliation.

340.    During an interview with Investigator Gibbons, Ms. Richardson told him she wanted to drop the allegations because Plaintiff had apologized to her.

341.    By July 26, 2024, Plaintiff had already transferred to the Shell Shop, and Ms. Richardson was no longer employed with HII at the time Plaintiff received this DAN.

342.    HI's Position Statement alleges that, "Ingalls submits that Plaintiff made a false statement in her sworn affidavit that, on May 25, 2024, Foreman Marsha Barnes threatened her with discipline if she "did not sleep with him".

As shown below, since May 25, 2024, Plaintiff made numerous, detailed complaints regarding co-employees and managers (including about discipline issued by Marsha Barnes) but never alleged sexual harassment or quid pro quo retaliation by Mr. Barnes for rejecting his alleged sexual advances.

- On June 12, 2024, Plaintiff submitted a Union grievance alleging Mr. Barnes improperly issued her the June 3, 2024 DAN for loafing. Plaintiff provided a two page response as to why she should not have received the DAN. Ms. Barnes never alleged that Foreman Barnes sexually harassed her or that he issued the DAN because she would not submit to his sexual advances. *See* Exhibit M.

- On July 17, 2024, Plaintiff submitted a Union grievance alleging that Mr. Barnes improperly issued her the June 18, 2024 DAN for unsatisfactory work. Plaintiff provided a two page response as to why she should not have received the DAN. Plaintiff never

alleged that Foreman Barnes sexually harassed her or that he issued the DAN because she would not submit to his sexual advances. *See* Exhibit I, at pp. 3-5, 7.

- On July 29, 2024, Plaintiff made an Open Line complaint alleging Mr. Barnes retaliated against her for her sexual harassment complaint against General Foreman Jeffrey Holmes. Plaintiff never alleged that *Foreman Barnes* sexually harassed her or that he issued any DANs because she would not submit to *his* sexual advances. *See* Exhibit N.

- On August 16, 2024, Plaintiff prepared a 21 page complaint to investigators in the Ethics and Business Conduct Office. *See* Exhibit O. In this complaint, Plaintiff made various allegations about Mr. Barnes including a baseless allegation that Mr. Barnes was intoxicated at work. Plaintiff does not allege anywhere in the 21 page complaint that Mr. Barnes sexually harassed her or that he issued any DANs because she would not submit to his sexual advances. Even more glaring by her omission, the complaint also included a chronology with specific dates. In her chronology, Plaintiff wrote:

"May 24 - Barnes told me Black said I could no longer keep my cases of water in the office and the water that was currently in there had to be out by the end of the day or it will be thrown away. Because I was not there to get the remainder of my water, he said he and other Foremen placed the water in their areas and drank it, since he threatened to trash it".

"May 28 - Barnes told me that he believes Harmony Richardson was sent to our area to mentally and emotionally attack me. He said it was their hope that Harmony could have gotten me so upset that I reacted to her badly to the extent that it got me fired".

Plaintiff did not include in her chronology of grievances between May 24 (for not being able to keep water in an office) and May 28 (complaint against co-employee) that Mr.

Barnes threatened her on May 25 with discipline if she did not sleep with him. *See* Exhibit O.

- On August 27, 2024, Plaintiff filed an NLRB Charge alleging that Ingalls discriminated against her by issuing discipline to her because of her union activities or membership. Plaintiff never alleged that Foreman Barnes sexually harassed her or that he issued any DANs because she would not submit to his sexual advances. *See* Exhibit P.

- On November 6, 2024, Plaintiff prepared a seven page written complaint (Exhibit Q) and separate two page written complaint (Exhibit R) that she submitted to investigators in the Ethics and Business Conduct Office. Again, Plaintiff makes numerous allegations against Mr. Barnes, other management employees, and other co-employees. Plaintiff never alleged that Foreman Barnes sexually harassed her or that he issued any DANs because she would not submit to his sexual advances.

- On November 12, 2024, Plaintiff submitted a Union grievance alleging a female co-employee violated Ingalls' Anti-Harassment policy. *See* Exhibit S. Plaintiff never filed a grievance alleging that Foreman Barnes sexually harassed her or that he issued any DANs because she would not submit to his sexual advances."

343.    Plaintiff contends this allegation is false and misleading.

344.    Plaintiff maintains that Mr. Barnes repeatedly warned her that he was under pressure from General Superintendent Black to "write up [Plaintiff] for anything until she is terminated," and that the only way he would protect her was if she submitted to his sexual demands.

345.    Given that circumstance, it was not unusual that Plaintiff initially challenged the resulting write-ups on their face, focusing on their factual inaccuracies and procedural

impropriety, rather than immediately documenting Mr. Barnes' sexual propositions in union grievances or Open Line complaints that she knew would quickly be funneled back to the very supervisors orchestrating the retaliation.

346.    Plaintiff further contends that she, like many sex harassment victims, initially omitted sensitive details in earlier complaints due to fear, embarrassment, or distrust of the employer's internal processes.

347.    Despite these barriers, however, she consistently documented retaliation, false write-ups, intimidation, and hostile treatment, each of which was linked to Mr. Barnes, but only later, as the pattern escalated and after repeated quid pro quo propositions, did she feel compelled to state explicitly what she had been enduring all along.

348.    HII's attempt to weaponize the absence of early explicit complaints of sex harassment ignores the obvious truth that voicing complaints openly about sexual harassment carried the risk of further retaliation and career destruction.

349.    Finally, it is important to note that the existence of multiple grievances.

350.    Plaintiff's Open Line complaints and detailed submissions to Ethics and Labor Relations shows that she was not silent, but persistent.

351.    She consistently raised the alarm about Mr. Barnes' retaliatory behavior, his false write-ups, and the retaliatory environment he created.

352.    HI's Position Statement alleges that, "Mr. Barnes denies that he ever propositioned or sexually harassed Plaintiff or issued any discipline to retaliate against Plaintiff. Mr. Barnes has worked at Ingalls for nearly 10 years as a union represented employee and Foreman. Mr. Barnes has regularly received training on Ingalls' Anti-

Harassment policy and Anti-Retaliation policy. Mr. Barnes has never received discipline for any reason in the four years he has worked as a Foreman. Mr. Barnes has never received any discipline for violating Ingalls' Anti-Harassment policy, dignity and respect policy, or any other offenses against other employees in the years he worked as a union represented employee. The Ethics and Business Conduct Office has not received any complaints that Mr. Barnes violated any of these policies."

353.    Plaintiff contends this allegation is false.

354.    Mr. Barnes' denials are contradicted by multiple statements he made directly to Plaintiff, some of which were made in the presence of others, tying disciplinary action and protection from Mr. Black's retaliation to whether she engaged in a sexual relationship with him.

355.    For example, Mr. Barnes told Plaintiff, "If you don't want me to keep writing you up until you get fired, you know what you have to do. You take care of me; I take care of you."

356.    Later, in the presence of General Foreman Patterson, Mr. Barnes admitted Mr. Black had ordered him to write up Plaintiff.

357.    When Mr. Patterson left, Mr. Barnes privately told me, "Baby girl, if you just rock with me, I'll take these write-ups off and protect you from Black. But if you don't, there's nothing I can do—Black wants you gone."

358.    The June 3 "loafing" DAN and the June 18 "unsatisfactory work" DAN, both later discredited through the grievance process and by statements from Manufacturing Analyst Jenkins and General Foreman Patterson, show a pattern of false discipline being weaponized against Plaintiff.

359.    Mr. Barnes admitted to Plaintiff that these write-ups originated from Mr. Black but made it clear that he (Mr. Barnes) controlled whether they were issued or removed, conditioned on her submission to his sexual demands.

360.    The allegation emphasizes that the Ethics and Business Conduct Office had not previously received complaints against Mr. Barnes.

361.    However, the absence of prior complaints is more reasonably explained by the climate of retaliation and intimidation at HII, where employees, particularly women, fear speaking out.

362.    Plaintiff's case sharply illustrates this reality in that after she reported Mr. Holmes she was demoted, targeted, and repeatedly written up under false pretenses.

363.    Mr. Barnes and Mr. Black openly told Plaintiff that she would "never be a Welding Foreman" and would be "written up until terminated" for coming forward.

364.    In such an environment, silence is not proof of compliance with policy, it is proof of fear.

365.    The fact that Mr. Barnes had not previously been disciplined for harassment proves nothing.

366.    On March 25, 2025, Plaintiff filed an EEOC Charge (Charge #: 425-2025-01016) of sex discrimination, sex harassment, disability discrimination, hostile work environment, and retaliation.

367.    On March 25, 2025, Plaintiff filed an amendment for her previously filed EEOC Charge (Charge #: 425-2024-01706).

368.    On April 30, 2025, in response to Plaintiff's EEOC Charge (425-2025-01016), HI submitted a Position Statement to the EEOC.

369.    HI's Position Statement alleges that, "Plaintiff cannot show that Mr. Black made harassing statements about her alleged disability. Plaintiff alleges her disabling conditions include PTSD, anxiety, depression, and a restrictive lung condition. In numerous and very detailed complaints, Plaintiff never alleged Mr. Black made any disparaging remarks regarding these conditions. Also, in her charge, Plaintiff does not allege any additional acts of retaliation by Mr. Black based on her complaints of sexual harassment. Finally, Plaintiff cannot show that Ingalls denied her a reasonable accommodation. Since about November 14, 2024, Plaintiff's own personal physician declared that was "unable to perform all job duties". To accommodate her condition, Ingalls provided Plaintiff a reasonable accommodation in the form of a partially paid medical leave of absence."

370.    Plaintiff contends this allegation is false and misleading.

371.    First, it is inaccurate to claim that Mr. Black "never made disparaging remarks" about Plaintiff's disability.

372.    Between July and November 2024, he repeatedly questioned the legitimacy of Plaintiff's medical restrictions in conversations with other supervisors, including Superintendent Marvin Eanochs and General Foreman McQueen, stating, "I don't believe she is really sick" and suggesting that Plaintiff was abusing the system.

373.    These comments were relayed to Plaintiff by coworkers and compounded the stigma she already faced as someone managing PTSD, anxiety, depression, and a restrictive lung condition.

374.    Mr. Black's dismissive remarks directly undermined Plaintiff's credibility, fueled gossip, and aggravated the very symptoms of stress and anxiety her doctors were

attempting to treat.

375.    Second, HII's assertion that Plaintiff did not allege "additional acts of retaliation by Black" is demonstrably false.

376.    Mr. Black instructed Foreman Barnes to "write up [Plaintiff] for anything until [she] was terminated."

377.    Mr. Black also blocked Plaintiff from being placed as Work Leader in the Shell Shop explicitly because she had filed an EEOC complaint, and he consistently assigned her to the most physically demanding tasks, including eight to ten hours per day of welding, which blatantly violated her medical restrictions.

378.    Mr. Black also refused her transfer requests to other programs, despite other Foremen such as Lake and McQueen requesting her for their teams. Each of these actions was retaliatory.

379.    Third, HII misrepresents forced leave as a "reasonable accommodation."

380.    The ADA makes it clear that involuntary leave is not an appropriate accommodation when an employee can perform essential job duties with restrictions.

381.    Plaintiff's physician consistently provided restrictions permitting her to work safely with modifications, such as limiting welding hours with 15-minute breaks every two hours.

382.    HII disregarded those restrictions, delayed acceptance of revised restrictions for nearly a month in April–May 2025 and insisted that Plaintiff either perform full-duty welding or remain out of work.

383.    Male comparators were regularly granted light duty or transitional roles, but Plaintiff was denied that option and pushed out of the workplace under the guise of

"accommodation."

384.   Fourth, Mr. Black's hostility was not limited to dismissive remarks.

385.   His conduct escalated into direct harassment.

386.   On November 13, 2024, Mr. Black began yelling at Plaintiff, refusing to leave her immediate workspace even after she asked him to step away.

387.   His aggressive presence and refusal to disengage left her fearful for her safety and triggered a severe mental and physical response, including panic symptoms and respiratory distress.

388.   The incident was so traumatic that Plaintiff was forced to contact law enforcement, resulting in a police report and subsequent court proceedings for stalking and harassment.

389.   That Plaintiff had to seek police and court intervention against a senior manager underscores the gravity of the hostile environment HII allowed to persist and its negligence in addressing repeated warnings about Mr. Black's conduct.

390.   Finally, HII's attempt to minimize Plaintiff's November 14, 2024 medical leave as a "reasonable accommodation" is misleading.

391.   That leave was not voluntary.

392.   It was the direct result of HII's negligence in ignoring her physician's restrictions, failing to curb Mr. Black's retaliatory harassment, and subjecting Plaintiff to conditions that exacerbated her PTSD, anxiety, depression, panic attacks, and asthma.

393.   By dismissing her well-documented complaints, HII made itself part of the harm.

394.   HII's actions reflect not accommodation, but constructive removal:

sidelining me through forced leave rather than engaging in the interactive process the ADA requires.

395.    HI's Position Statement alleges that, "Since the beginning of her employment, Plaintiff has sought medical leaves of absences for mental illness. For example, in May of 2021, Plaintiff sought and was placed on a medical leave of absence for "post traumatic disorder" and "adult abuse trauma". See Exhibit A. As another example, in October of 2021, Plaintiff sought and was placed on a medical leave of absence for "post traumatic stress disorder", "major depressive disorder", and "adult physical abuse". See Exhibit B."

396.    Plaintiff contends that her past leaves of absence for PTSD, depression, and trauma-related issues were well documented.

397.    This history highlights HII's duty duty under the ADA to engage in the interactive process, provide reasonable accommodations, and ensure that Plaintiff was not subjected to harassment or retaliation that exacerbated her disabilities.

398.    As detailed above and below, Plaintiff contends that HII failed to accommodate her disabilities, allowed her to be harassed related to her disabilities, and allowed her to be retaliated against due to her disabilities.

399.    HI's Position Statement alleges that, "Between August 16, 2024 and November 22, 2024, Plaintiff made numerous detailed complaints about Mr. Black. These written complaints comprised 41 single-spaced pages. See Exhibits C, D, E, F, G, H. Plaintiff never once alleged in these written complaints that Mr. Black made any statements about her PTSD, anxiety, depression, an alleged restrictive lung condition or any medical condition. Mr. Black denies that he ever he made any inappropriate

statements about Plaintiff's medical condition. (As reflected in her 2021 diagnoses, Plaintiff falsely alleged that her recent complaints about Mr. Black "led to a diagnosis of PTSD, chronic anxiety, and depression". See Exhibit F, at p. 2 (emphasis added).)"

400.    Plaintiff contends that HII's assertion that she "never alleged" Mr. Black made statements about her medical conditions false.

401.    Mr. Black repeatedly questioned the legitimacy of Plaintiff's illnesses and FMLA usage by making calls to General Foreman McQueen, accusing Plaintiff of "feigning illness" and "abusing FMLA."

402.    Mr. McQueen relayed these comments directly to Plaintiff and to Foreman Lake.

403.    In her written complaints to the company, Plaintiff explicitly documented that Mr. Black was continually making remarks that her illnesses were "fake" and that she was improperly using medical leave.

404.    HII's own position statement acknowledges that Mr. Black called Mr. McQueen regarding Plaintiff's attendance and FMLA, confirming that he engaged in a pattern of inquiries that had no legitimate purpose.

405.    At that time, Plaintiff was not under Mr. Black's chain of command, and therefore her attendance and FMLA status were not his responsibility or concern.

406.    Mr. Black's repeated inquiries and accusations constituted harassment and interference with her FMLA leave.

407.    Moreover, Mr. McQueen made it clear that Mr. Black never asked such questions about other employees who were using FMLA leave.

408.    HII also misrepresents Plaintiff's statements regarding her mental health

conditions.

409.    Plaintiff never alleged that Mr. Black caused her diagnosis" of PTSD, chronic anxiety, or depression.

410.    Plaintiff's medical records confirm that those diagnoses predated the incidents in question.

411.    What Plaintiff stated, and what remains accurate, is that Mr. Black's actions, including harassment, stalking, and retaliatory treatment, exacerbated her existing conditions, triggered traumatic symptoms, and worsened her mental health.

412.    HI's Position Statement alleges that, "In one of her complaints, Plaintiff alleged that, "on August 21, 2024", Mr. Black questioned her FMLA. See Exhibit D, at p. 1. Ingalls maintains an absence policy that can lead to discipline unless an absence is related to FMLA-qualifying leave. On April 29, 2024, Ingalls approved Plaintiff for intermittent FMLA leave for doctor appointments for allergies such that she might miss four to eight hours of work a day. There was a concern, however, that Plaintiff was claiming FMLA when she simply arrived late to work. See Exhibit H. Plaintiff repeats this complaint in one of her complaints she made on November 6, 2024. See Exhibit F, at p. 1. Plaintiff did not receive any discipline for attendance based on this simple inquiry."

413.    Plaintiff asserts that HII grossly mischaracterizes General Superintendent Black's repeated questioning about her FMLA as a "simple inquiry."

414.    Mr. Black's repeated questioning was not simple and it constituted both interference and retaliation related to her use of FMLA.

415.    FMLA is administered through Ingalls' Medical Leave Desk and maintained as confidential medical information.

416.    Supervisors and managers, particularly Mr. Black, had no legitimate reason to inquire into the details of her FMLA usage or to question her medical appointments.

417.    His repeated actions were not inquiries; they were targeted harassment.

418.    Mr. Black continuously questioned General Foreman McQueen about Plaintiff's clock-in and clock-out times, her medical absences, and whether she was legitimately sick.

419.    Mr. McQueen and Foreman Lake directly relayed Mr. Black's comments to Plaintiff, often in the presence of other employees.

420.    Mr. Black went so far as to question the validity of her doctor's appointments and openly insinuated that she was feigning illness.

421.    These actions went beyond mere curiosity.

422.    They undermined Plaintiff's credibility, stigmatized her in the workplace, and created a hostile environment.

423.    Furthermore, both Mr. McQueen and Mr. Lake informed Plaintiff that other employees in the Shell Shop were also on intermittent FMLA and had missed significantly more time than Plaintiff had.

424.    Yet, Mr. Black never questioned their attendance, never suggested they were abusing the system, and never harassed their supervisors about the legitimacy of their FMLA.

425.    Plaintiff was singled out as the only employee whose FMLA usage Mr. Black interrogated and discredited.

426.    HI's Position Statement alleges that, "Since about September 26, 2024, (Any discrete actions by Mr. Black prior to this date would be time barred under the

applicable statute of limitations.) Plaintiff alleged incidents of retaliation by Mr. Black for reporting sexual harassment.

In one complaint, Plaintiff alleged that Mr. Black repeatedly pressured other managers to issue DANs to her. *See* Exhibit F, at p. 5. Mr. Black denies that he pressured other managers to issue DANs to Plaintiff. The managers also deny that Mr. Black pressured them to issue DANs to Plaintiff. Indeed, Plaintiff last received a DAN on July 26, 2024. In response to her first EEOC charge, Ingalls showed that it properly issued the July 26, 2024 DAN for a "dignity and respect" violation by Plaintiff against another employee. Moreover, Ingalls explained that, per the requirements of the CBA, that DAN and all prior DANs are now void.

In another complaint, Plaintiff alleged that Mr. Black entered the Shell Shop to monitor her and inspect her jobs for quality. *See* Exhibit F, at p. 4. As of September 26, 2024, Plaintiff was no longer in Mr. Black's chain of command. However, Mr. Black had responsibility for welding quality and compliance for the entire welding department. As part of these duties, Mr. Black inspects work in all shops including the Shell Shop. On one occasion, Mr. Black pointed out welding seams that had not been welded correctly. Mr. Black did not know who welded the seams when he pointed out the improper weld to other management. It was learned later that Plaintiff and another welder performed that weld. Plaintiff did not receive any discipline for the improperly welded seam.

In another complaint, Plaintiff alleged that Mr. Black prohibited her from working overtime on Saturday, October 20, 2024. *See* Exhibit F, at p. 5. Specifically, she alleged that Mr. Black told Foreman Hopson not to schedule her for overtime and threatened disciplinary action against Mr. Hopson. This statement is false. Per the CBA, Ingalls first offers

overtime to the crew that needed to work overtime. Plaintiff did not work on Mr. Hopson's crew and just showed up on October 20, 2024 in hopes of getting picked up for overtime. Mr. Hopson assigned only employees on his crew so he did not have the option to pick up other welders not on his crew. Mr. Hopson denies that Mr. Black told him not to accept Plaintiff for overtime on that date, denies that Mr. Black threatened him if he did accept her for overtime on that date, and denies that Mr. Black even mentioned Plaintiff's name in regard to the overtime assignment. In another complaint, Plaintiff alleged that, on October 25, 2024, she "was told" by General Foreman McQueen that Mr. Black requested that she be transferred from the Shell Shop to the DDG Program. *See* Exhibit F, at p. 3. Mr. McQueen stated that, on that date, Mr. Black mentioned moving a welder out of the Shell Shop. Mr. Black did not specifically name the welder. Mr. McQueen thought that Mr. Black meant to move Plaintiff. Mr. McQueen and Foreman Lake told Plaintiff she had to move from the Shell Shop. When discussing with him the next day, however, Mr. Black clarified that he had been talking about another female welder for the move. Mr. Lake promptly notified Plaintiff that there was a mistake and she did not have to move from the Shell Shop. As of November 14, 2024, when she began a continuous leave of absence, Plaintiff continued to work in the Shell Shop."

427.    Plaintiff contends that HII's assertion that "any discrete actions by Mr. Black prior to September 26, 2024, would be time barred" is false.

428.    Mr. Black's retaliatory actions against Plaintiff, including orchestrating repeated write-ups through Mr. Barnes, denying transfers, blocking promotions, questioning her protected FMLA usage, and directly harassing her in the workplace, were part of an ongoing and escalating course of conduct that extended well beyond

September 26, 2024.

429.    Even if certain events occurred prior to that date, they remain actionable as part of the "continuing violation doctrine," which allows earlier acts to be considered when they are linked to ongoing retaliation and harassment that continued into the limitations period.

430.    Mr. Black's most egregious acts, including the November 13, 2024 incident in the Shell Shop where he came into Plaintiff's work area yelling and refusing to leave, which led to a police report and court proceedings for stalking and harassment, demonstrate the continuity and severity of his retaliation.

431.    General Foreman McQueen witnessed the incident.

432.    HII omits critical facts regarding Mr. Black's retaliatory conduct.

433.    Contrary to his denials, Mr. Black repeatedly pressured managers to issue false DANs against Plaintiff, beginning with the very first DAN in June, which bore his name as a witness and demonstrated his involvement in directing Mr. Barnes to write up Plaintiff.

434.    When Plaintiff confronted Mr. Black about the June 18 VT DAN, he admitted he told Mr. Barnes to issue it.

435.    Mr. Barnes further confirmed to Plaintiff on multiple occasions that Mr. Black instructed him to continue writing up Plaintiff "until she is terminated."

436.    When Plaintiff later transferred into the Shell Shop under the supervision of Mr. Lake and Mr. McQueen, Mr. Black attempted to coerce them into doing the same, even fabricating false claims that Plaintiff had welded seams improperly.

437.    Both Mr. Lake and Mr. McQueen, however, refused to act on those

accusations because they knew they were untrue.

438.    As explained above, the "dignity and respect" DAN against Plaintiff was premised on a false narrative.

439.    Ms. Richardson had a well-documented history of insubordination and verbal abuse toward supervisors.

440.    Ms. Richardson later withdrew her complaint, admitting she did not want to pursue it because it was false.

441.    Despite this withdrawal, HII allowed the matter to remain on record and later used it against Plaintiff over a month after Ms. Richardson was terminated.

442.    Notably, Ms. Richardson was ultimately terminated for her own dignity and respect violations after cursing out upper management, including General Foreman Patterson.

443.    HII also attempts to portray Mr. Black's frequent presence in the Shell Shop as routine.

444.    That is categorically untrue.

445.    Foremen Lake and Langdon, whose statements have been omitted, both acknowledged that prior to her reassignment, Mr. Black rarely entered the Shell Shop, perhaps once or twice a month.

446.    Yet while she was stationed there, he came in four to five times a week, often two to three times a day, never to discuss welding or shipfitting issues with Mr. Lake or Mr. Langdon, but specifically to monitor, confront, and harass Plaintiff.

447.    Since her reassignment away from the Shell Shop, Mr. Black's visits ceased, confirming that his conduct was targeted surveillance and harassment of Plaintiff.

448.    Under the collective bargaining agreement, Mr. Black was prohibited from directly confronting Plaintiff; any legitimate issues should have been routed through her foreman or superintendent.

449.    His repeated and direct confrontations were in violation of the CBA and a clear continuation of retaliatory stalking.

450.    Regarding overtime, HII misrepresents the facts.

451.    For years, Plaintiff regularly worked overtime with Hobson's crew whenever overtime was available, consistent with the CBA.

452.    On October 20, 2024, Hobson initially gave Plaintiff a task sheet and permitted her to begin work, but later, after receiving instruction from Mr. Black, he ordered Plaintiff to leave.

453.    Plaintiff was compensated for the time she worked before being sent home, confirming that she had, in fact, been allowed to begin overtime until Mr. Black intervened.

454.    In addition, Superintendent Bartlett confirmed directly to Plaintiff that Mr. Black called him and instructed that Plaintiff was not to be permitted overtime going forward.

455.    Under the CBA, Ingalls employees take precedence over contractors, yet contractors remained working while Plaintiff was sent home.

456.    The attempt to reframe this as a neutral application of overtime assignment rules is false.

457.    Finally, HII downplays the October 26, 2024 incident where General Foreman McQueen told Plaintiff that Mr. Black requested she be transferred from the Shell Shop to DDG.

458.   Mr. McQueen was clear in relaying that Mr. Black had specifically identified Plaintiff.

459.   Only after she contacted Ethics Investigator Aaron Dunstan did Mr. Black reverse course, fabricating a story that he had been referring to another welder.

460.   This was not an innocent misunderstanding; it was a deliberate effort to remove Plaintiff from the Shell Shop, where her medical restrictions and safety were best protected, and force her back into the hostile DDG environment under Mr. Black's direct control.

461.   Ingalls' narrative ignores the fact that only after Ethics intervened did Mr. Black backtrack, further confirming the retaliatory nature of his actions.

462.   HI's Position Statement alleges that, "As of November 14, 2024, Plaintiff sought a medical leave of absence due to major depressive disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD")". Her personal physician declared that Plaintiff was "unable to perform all duties" as of November 14, 2024. See Exhibit I (emphasis added). Plaintiff's personal physician extended her restrictions prohibiting her from returning to work until April 8, 2025. On that date, the personal physician released her to return to work with an accommodation "to have more breaks as needed due to her anxiety". See Exhibit J."

463.   Plaintiff contends this allegation mischaracterizes the events that occurred and omits relevant context.

464.   Plaintiff's medical leave, beginning November 14, 2024, was not a voluntary or neutral medical absence but was necessitated by the escalating harassment, retaliation, and hostile work environment created by General Superintendent Black and

others.

465.    Plaintiff's physician determined Plaintiff was unable to continue working only after Mr. Black's conduct culminated in a November 13, 2024 incident which Mr. Black aggressively confronted Plaintiff in the Shell Shop.

466.    Plaintiff contends her leave of absence was directly tied to the company's negligence in addressing this harassment, not merely due to an independent medical matter as HII alleges.

467.    When Plaintiff's physician cleared her to return on April 10, 2025 with restrictions requiring additional breaks due to anxiety, HII unlawfully refused to honor those restrictions.

468.    Instead, through the leave desk and its representative Gabrielle Parrish, HII expressly stated in writing that the company does not allow employees to return to work with restrictions unless the restrictions are tied to a workers' compensation injury.

469.    Parrish confirmed that if restrictions are "non-industrial," the company will not allow an employee to return until they are "completely cleared" of all restrictions.

470.    This policy is a violation of the ADA because it eliminates the employer's obligation to engage in an individualized assessment and provide reasonable accommodations to the employee.

471.    This was not an isolated error or misunderstanding.

472.    Plaintiff's restrictions were repeatedly denied in writing.

473.    HII eventually informed Plaintiff that her restrictions would be "accepted," and on May 5, 2025, she was reinstated under false pretenses based on assurances from company physician Dr. McRaney, who stated he had spoken with Hull Chief of Staff Jenni

Jones or her designee and received approval.

474.    However, when Plaintiff physically returned to work on May 15, 2025, HII refused to honor her restrictions and assigned her to tasks inconsistent with her doctor's directives.

475.    To this day, her restrictions remain unacknowledged and unimplemented.

476.    HI's Position Statement alleges that, "Ingalls physician Charles McRaney engaged in an interactive process with a counselor at the physician's office and with Plaintiff. On April 22, 2025, the personal physician's office clarified Plaintiff's restrictions to recommend a 15 minute break for every two hours of work as needed. See Exhibit K. On April 25, 2025, Ingalls notified Plaintiff that she was "cleared to return to work at this time". See Exhibit L. On April 28, 2025, Plaintiff did not return to work stating that again "my doctor is currently revising my restrictions" before she could return to work. See Exhibit L. Since mid-November, Plaintiff has received non-taxable short term disability payments of $345 per week for the entirety her medical leave of absence. See Exhibit M."

477.    Plaintiff contends that this allegation mischaracterizes both the circumstances of her medical leave and HII's handling of her return to work.

478.    While it is true that Plaintiff's physician certified her as unable to perform all duties beginning November 14, 2024, and later released her to return on April 10, 2025 with restrictions for additional breaks due to anxiety, HII failed to honor those restrictions.

479.    Upon Plaintiff's physician's release, she attempted to return on April 10, 2025; however, the leave desk, through Gabrielle Parrish, explicitly told Plaintiff that because she had restrictions, she would not be allowed to return.

480.    Ms. Parrish further admitted that it was the department's "common practice"

to bar employees with restrictions from returning to work, a blanket "no restrictions" policy that is unlawful under the ADA because it ignores the employer's duty to engage in an individualized, interactive process and to provide reasonable accommodations when employees are otherwise capable of working.

481.    Instead of engaging in that process, HII improperly extended Plaintiff's leave for another thirty days against her wishes and contrary to medical advice.

482.    Ultimately, HII reinstated Plaintiff on May 5, 2025 under false pretenses, claiming they would honor her restrictions.

483.    Dr. McRaney, the company physician, assured her that he had spoken with Hull Chief of Staff Jenni Jones or her designee and that leadership had approved Plaintiff's restrictions.

484.    Based on those assurances, Plaintiff was told she could return to work and was reinstated on May 5, 2025.

485.    However, when she physically returned on May 15, 2025, HII immediately disregarded those restrictions, placed Plaintiff back into assignments inconsistent with her medical directives.

486.    During her conversation with Dr. McRaney, he stated that whatever Plaintiff's medical restrictions were, as long as everything was documented in writing by her physician, the Hull Department had decided to accept them.

487.    Yet HII reversed course after reinstating Plaintiff, first representing that her restrictions would be honored and then refusing to recognize them once she returned.

488.    Plaintiff was left to obtain further clarification from my physician, who maintained the restrictions in place, but HII has not accepted or implemented them since

her return.

489.    HI's Position Statement alleges that, "Plaintiff cannot show that Mr. Black verbally harassed her based on her medical condition. In 41 pages of complaints, Plaintiff never alleged that Mr. Black made statements about her medical condition. Mr. Black denies that he made any statements to Plaintiff about her medical conditions. Rather, she claimed that Mr. Black's actions caused her to develop PTSD, chronic anxiety, and depression. This is a clearly false statement as Plaintiff had been diagnosed with these conditions as early as 2021. Other than this claim, Plaintiff alleged that Mr. Black questioned her FMLA. As noted above, there was a legitimate question on whether Plaintiff improperly claimed FMLA for intermittent absences when arriving to work late. There is no basis to argue that Mr. Black engaged in severe or pervasive conduct that resulted in a hostile work environment based on her alleged disabilities."

490.    Plaintiff contends this allegation is false.

491.    On multiple occasions, beginning in mid-2024 and continuing through November 2024, Mr. Black openly questioned the legitimacy of Plaintiff's medical restrictions and disparaged her use of protected leave.

492.    General Foreman McQueen and my foreman Lake directly informed Plaintiff that Mr. Black was questioning whether she was "really sick," whether she was "faking" the need for leave, and why she was "always at the doctor."

493.    These statements, although sometimes relayed through intermediaries, were pervasive and targeted specifically at Plaintiff's medical condition, thereby undermining her credibility and fueling a hostile work environment.

494.    HII's attempt to dismiss Plaintiff's claims by pointing to her pre-existing

PTSD, anxiety, and depression since 2021 is also a flawed argument.

495.    The ADA does not strip protections from individuals simply because they had pre-existing conditions.

496.    Rather, once HII was aware of Plaintiff's medical history, it heightened their legal duty to protect her from harassment and retaliation that exacerbated her disability.

497.    Plaintiff's claim was not and is not that Mr. Black "caused" her PTSD to exist where it never existed before; her claim is that Mr. Black's conduct, including stalking, intimidation, and repeated questioning of her medical legitimacy, aggravated and worsened her conditions, directly contributing to the medical leave she was forced to take in November 2024.

498.    The ADA is clear that worsening or aggravating a disability through hostile treatment is itself unlawful.

499.    As for HII's allegation that Mr. Black was merely asking "legitimate questions" about FMLA, this too is inaccurate.

500.    Under the FMLA, inquiries into the legitimacy of an employee's protected leave are handled exclusively through the medical leave desk, not by supervisors.

501.    Mr. Black repeatedly crossed that boundary, questioning my foremen, my coworkers, and even confronting me indirectly by relaying skepticism through others.

502.    This was not a neutral or "simple inquiry"—it was harassment that singled her out.

503.    Importantly, Mr. McQueen and Mr. Lake both told Plaintiff that other Shell Shop employees with FMLA had missed more time than she had, yet Mr. Black never questioned them. I was the only one targeted in this way.

504.    Finally, HII's assertion that Mr. Black's conduct was not "severe or pervasive" ignores the totality of the circumstances.

505.    Mr. Black's repeated questioning of Plaintiff's health, his pressuring of other managers to write her up, his stalking her in the Shell Shop multiple times a week, and his escalation on November 13, 2024 that left her fearing for her safety all combined to create a hostile work environment.

506.    His actions directly contributed to the exacerbation of her mental health and her need for extended medical leave.

507.    By dismissing these experiences as minor or nonexistent, HII once again shows deliberate indifference to both the facts and the law.

508.    HI's Position Statement alleges that, "Plaintiff cannot show that Mr. Black retaliated against her for complaining about sexual harassment. In one complaint, Plaintiff alleged that Mr. Black pressured others to issue DANs to Plaintiff. Mr. Black denies that he did so. Indeed, since July, Plaintiff has not received any DANs. In another complaint, Plaintiff alleged that Mr. Black entered the Shell Shop to monitor her and inspect her jobs for quality. Mr. Black had work responsibilities in the Shell Shop including over weld quality. Mr. Black noticed an improper weld that he later learned had been completed by Plaintiff. Again, Plaintiff did not receive a DAN over this issue. In another complaint, Plaintiff alleges that Mr. Black told a Foreman not to assign Plaintiff to weekend overtime. The Foreman denies that Mr. Black told him not to pick up Plaintiff. In any event, the Foreman filled his overtime assignments with employees on his crew. Finally, Plaintiff claims she "was told" she would move out the Shell Shop. There was a mistake in conveying who had to move out of the Shell Shop, Plaintiff was notified she did not move

out the Shell Shop, and she in fact remained in the Shell Shop until she sought a medical leave of absence on November 14, 2024. There is no basis to allege that Mr. Black retaliated against Plaintiff because she complained of sexual harassment."

509.    As Plaintiff has shown repeatedly already, this allegation is false.

510.    While HII attempts to minimize Mr. Black's conduct by focusing on the absence of formal DANs after July, retaliation is not limited to formal discipline.

511.    Retaliation also includes unwarranted scrutiny, denial of opportunities, interference with work assignments, and pressure toward her with the goal of getting her to quit.

512.    After Plaintiff complained of sexual harassment, Mr. Black repeatedly targeted her in each of these ways.

513.    First, with respect to DANs, Mr. Black openly admitted to Plaintiff and to others that he directed Mr. Barnes to issue write-ups at his (Mr. Black's) instruction.

514.    Mr. Barnes told Plaintiff repeatedly that Mr. Black was pressuring him to "write up [Plaintiff] for anything" until she was terminated.

515.    The fact that Plaintiff did not receive further DANs after July is not evidence of the absence of retaliation; it is evidence that her complaints and grievances forced additional scrutiny and caution around the issuance of discipline.

516.    Second, Mr. Black's repeated and unnecessary presence in the Shell Shop was not routine "quality inspection."

517.    Prior to her transfer into the Shell Shop, management acknowledged that Mr. Black rarely entered that area, perhaps once or twice a month at most.

518.    After she moved there, Mr. Black began appearing four to five times a week,

sometimes two or three times a day, often without speaking to the foremen responsible for the shop.

519.    Foremen Lake and Langdon can both confirm that Mr. Black's visits were abnormal and centered on Plaintiff, not on overall production.

520.    Singling out Plaintiff for scrutiny, questioning her work, and attempting to manufacture quality issues—even when no DAN followed—constituted retaliatory harassment against her after she filed her complaints.

521.    Third, regarding overtime, Mr. Black directly interfered with Plaintiff's opportunities.

522.    On October 20, 2024, after Plaintiff had been permitted to work on Hobson's crew as she had done consistently for years, she was told to leave mid-shift under Mr. Black's direction.

523.    Superintendent Bartlett personally informed Plaintiff that Mr. Black had called to say she was no longer allowed to work overtime.

524.    That interference was a tangible loss of income and a retaliatory act directly tied to her protected activity.

525.    HII's reliance on Hobson's denial omits the corroborating statement from Bartlett, whose testimony confirms that Mr. Black personally intervened to deny Plaintiff overtime.

526.    Finally, with respect to the attempted transfer, it is misleading for HII to allege that this was a mere "mistake."

527.    General Foreman McQueen directly told Plaintiff that Mr. Black had requested she be moved out of the Shell Shop and back into DDG, a program under his

control and the same environment where she had previously experienced harassment.

528.    The only reason this transfer did not occur was because Plaintiff immediately escalated the matter to Ethics Investigator Erin Dunstan, who intervened.

529.    Mr. Black's conduct was intentional, not mistaken—he attempted to remove Plaintiff from the safer environment of the Shell Shop and place her back under his direct authority in DDG as an act of retaliation.

530.    HI's Position Statement alleges that, "Finally, Plaintiff cannot show that Ingalls denied her a reasonable accommodation. From November 14, 2024 to April 8, 2025, Plaintiff's personal physician declared that Plaintiff was "unable to perform all duties". When her physician placed restrictions on her return, Ingalls engaged in an interactive process with Plaintiff and her personal physician's office. Ingalls advised Plaintiff that she could return to work effective Monday, April 28, 2025. Plaintiff notified Ingalls that she would not return to work on that date because "my doctor is currently revising my restrictions". Plaintiff has received non-taxable short term disability payments of $345 each week of her leave of absence."

531.    Plaintiff contends this allegation is false.

532.    Plaintiff's November 14, 2024 medical leave was not voluntary.

533.    It was the direct result of Ingalls' refusal to honor Plaintiff's ADA restrictions and the escalating harassment she endured, culminating in the November 13, 2024 incident in which General Superintendent Black aggressively confronted her and left unable to safely remain at work.

534.    When Plaintiff's physician at Southern Psychiatry released her to return on April 10, 2025 with restrictions requiring additional breaks due to anxiety, HII, through its

leave desk, refused to reinstate Plaintiff and instead extended her leave until May 10, 2025.

535.    This was not based on medical necessity but on HII's blanket and unlawful practice of refusing to return employees with restrictions, in direct violation of the ADA.

536.    Email documentation from April through June 2025 with leave desk representative Gabrielle Parrish that confirms this practice.

537.    In one communication, Ms. Parrish wrote: "Just as expected, Hull Department is not accepting your restrictions."

538.    During a face-to-face meeting, Ms. Parrish went further, stating: "If your restrictions are not related to a workers' comp injury, Huntington Ingalls does not accept them. We do not allow employees to return to work with non-industrial restrictions. If you have restrictions, of any kind, even simple, you cannot return to work until you are 100% cleared."

539.    On May 5, 2025, HII reinstated Plaintiff under false pretenses, claiming that her restrictions had been approved.

540.    Company physician Dr. McRaney told Plaintiff that he had spoken with Hull Chief of Staff Jenni Jones or her designee and that Plaintiff's restrictions would be honored.

541.    Yet when Plaintiff returned on May 15, 2025, Ingalls immediately disregarded those restrictions, assigning her to work contrary to medical directives.

542.    On May 6, 2025, Licensed Independent Clinical Social Worker Dr. Miranda Goodwin wrote a letter regarding Plaintiff.

543.    The letter requested an extension of two to four weeks to support her mental

health recovery.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF TITLE VII - RETALIATION

544.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 543 above as if fully incorporated herein.

545.    Defendant retaliated against Plaintiff for reporting the incident of sexual harassment.

546.    The effect of the events described above deprived Plaintiff of equal employment opportunities in retaliation for exercising his federally protected rights.

547.    The unlawful actions of the Defendant complained of above were intentional.

548.    The unlawful employment practices described above were done with malice or with reckless indifference to the federally protected rights of Plaintiff.

549.    Plaintiff is entitled to protection from retaliation for making complaints or charges of discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq*.

550.    The acts of the Defendant constitute a willful intentional violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.,* and entitle Plaintiff to recovery of damages, both pecuniary and punitive in nature.

### COUNT II:  VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA) – DISABILITY DISCRIMINATION

551.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 550 above as if fully incorporated herein.

552.    Defendant discriminated against Plaintiff and failed to make reasonable accomodations because of her disabiity based on the facts identified above which constitutes a violation of the Americans with Disabilities Act.

553.    Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as deep humiliation, anxiety and emotional distress.

554.    The unlawful actions of Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.  As such, Plaintiff is entitled to recover damages pursuant to the ADA.

### COUNT III: VIOLATION OF TITLE VII - SEX DISCRIMINATION

555.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 554 above as if fully incorporated herein.

556.    Defendant discriminated against Plaintiff because of her sex, female, based on the facts identified above which constitutes violation of Title VII of the Civil Rights Act of 1964.

557.    Defendant was motivated to discriminate against Plaintiff because she is female.

558.    Plaintiff has suffered lost wages, benefits because of her termination and other pecuniary losses as well as deep humiliation, anxiety and emotional distress.

558.    The unlawful actions of Defendants complaint of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff giving rise to to both compensatory and punitive damages under Title VII.

### COUNT IV:  VIOLATIONS OF TITLE VII – SEXUAL HARASSMENT/SEXUALLY HOSTILE WORK ENVIRONMENT/SEX DISCRIMINATION

559.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 558 above as if fully incorporated herein.

560.    By the actions described above, Plaintiff has been discriminated against in the terms and conditions of her employment on the basis of her sex, female.

561.    By the actions described above, Defendant violated Title VII by allowing its employees to sexually harass Plaintiff in the workplace and by subjecting Plaintiff to a sexually hostile work environment.

561.    Plaintiff has been harmed as a result of the Defendant's discrimination, and the Defendant is liable to the Plaintiff for the same.

562.    The acts of the Defendant constitute a willful intentional violation of Title VII of the Civil Rights Act of 1964, as amended, and entitle Plaintiff to recovery of damages.

## **PRAYER FOR RELIEF**

**WHEREFORE PREMISES CONSIDERED,** Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1.    Back wages;
2.    Reinstatement or future wages in lieu of reinstatement;
3.    Compensatory damages;
4.    Punitive damages;
    5.    Attorney's fees;
    6.    Lost benefits;
    7.    Pre-judgment and post-judgment interest;
    8.    Costs and expenses; and
    9.    Such further relief as is deemed just and proper.

THIS the 29th  day of August 2025.

Respectfully submitted,

Jamie Dean Smith, Plaintiff

By: /s/Nick Norris

Nick Norris (MB# 101574)
Attorney for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC
4209 Lakeland Drive #365
Flowood, MS 39232
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: nick@watsonnorris.com